**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF**
**MINNESOTA**

| | |
|---|---|
| **JOHN CHOI**, *in his official capacity as the Ramsey County Attorney*;<br>    360 Wabasha Street N., Suite 100,<br>    Saint Paul, MN 55102<br><br>**BOB  FLETCHER**, *in  his  official capacity as Sheriff of Ramsey County;*<br>    425 Grove Street,<br>    Saint Paul, MN 55101<br><br>            *Plaintiffs,*<br>     **v.**<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY**;<br>    2707 Martin Luther King Jr. Ave SE, Washington, DC 20528-0485<br><br>**MARKWAYNE MULLIN**, *in his official capacity as Secretary of the U.S. Department of Homeland Security.*<br>    2707 Martin Luther King Jr. Ave SE, Washington, DC 20528-0485<br><br>            *Defendants.* | **Case No. 0:26-cv-3301**<br><br>**DEMAND FOR JURY TRIAL** |

<u>**COMPLAINT**</u>

1)     In December 2025, the U.S. Department of Homeland Security ("DHS") launched an immigration enforcement action in Minnesota called "Operation Metro Surge" ("Surge"). Described by DHS as the largest immigration operation in the Department's history, the Surge deployed thousands of armed and masked agents on the streets of Minnesota.

2)     The Surge intensified in January 2026. During this frigid month, masked and armed federal agents carried out illegal stops, sweeps, arrests, and dangerous raids

1

against countless residents. During the Surge, federal agents created widespread fear amongst Minnesota residents and caused hundreds of millions of dollars in lasting economic harm.

3)    During January 2026 in Minneapolis, federal agents shot and killed two people and shot and wounded another. On January 7, federal agent Jonathan Ross shot Renee Good in her car as she attempted to drive away from a scene.[1] On January 14, federal agent Christian Castro shot and wounded Julio Cesar Sosa-Celis when Castro shot through a closed front door of a home.[2] On January 24, federal agents Jesus Ochoa and Raymundo Gutierrez shot and killed Alex Pretti as he was attempting to help a woman who was pushed down by federal agents.[3] On May 18, the Hennepin County Attorney's Office announced that Agent Castro has been charged with four counts of second-degree assault and one count of falsely reporting a crime related to the Sosa-Celis shooting.[4] The Minnesota Attorney General's Office and Hennepin County Attorney's Office have sued several federal officials seeking key information and evidence to determine whether Ross, Ochoa, and Raymundo should be criminally charged related to the Good and Pretti killings.[5]

---

[1] *See* Liz Sawyer, Andy Mannix & Sarah Nelson, ICE agent who fatally shot woman in Minneapolis was dragged by car in earlier incident, MINN. STAR TRIB. (Jan. 8, 2026), https://www.startribune.com/ice-agent-who-fatally-shot-woman-in-minneapolis-is-identified/601560214 [https://perma.cc/E6XR-XH5M].

[2] *See Press Release*, Hennepin County Attorney's Office, Hennepin County Attorney's Office charges ICE agent in shooting of Julio Sosa-Celis (May 18, 2026), https://www.hennepinattorney.org/news/news/2026/may/castro-charges [https://perma.cc/UB9P-8S7N].

[3] *See* J. David McSwane, Two CBP Agents Identified in Alex Pretti Shooting, PROPUBLICA (Feb. 1, 2026), https://www.propublica.org/article/alex-pretti-shooting-cbp-agents-identified-jesus-ochoa-raymundo-gutierrez [https://perma.cc/Q9TT-2G3Y].

[4] *See* Hennepin County Attorney's Office, s*upra* note 2.

[5] *See* Compl., *State of Minnesota et al. v. U.S. Dep't of Justice, et al.*, No. 1:26-cv-01007 (D.D.C. Mar. 24, 2026), ECF No. 1.

4)      The Surge also greatly impacted the residents of St. Paul in January 2026. One such incident, the focus of this lawsuit, concerns a group of unnamed masked and armed individuals, who appeared to be federal agents, breaking into the home of a 56-year-old U.S. Citizen with no criminal history, ChongLy "Scott" Thao, on the afternoon of January 18, 2026.[6] That day, the masked and armed individuals broke through Thao's door with guns drawn and handcuffed him without providing a warrant. At the time, Thao was only wearing a pair of blue shorts, Crocs, and a baby blanket over his shoulders.[7] The masked and armed individuals ignored Thao's request to put on warmer clothes before they took him out of the home, without his consent, into 10-degree temperatures.[8] Images of a half-naked Mr. Thao being escorted to a vehicle driven by the masked individuals have been widely shared on social media and news stories. The masked and armed individuals then drove Mr. Thao around in a vehicle and questioned him for approximately one hour until they returned him to his home.[9]

5)      The Ramsey County Sheriff's Office ("RCSO") opened a criminal investigation into this incident. Based on the investigation so far, it is presumed that the masked and armed individuals involved were officers of one or more DHS agencies, although agents could not be individually identified. There is no indication the officers had a warrant for entry or arrest, and there is no other evidence available to Ramsey County investigators to determine if the officers acted lawfully.

---

[6] *See* Katelyn Vue, ICE broke down St. Paul man's door, walked him half-naked into freezing temps, SAHAN JOURNAL (Jan. 19, 2026), https://sahanjournal.com/immigration/st-paul-east-side-hmong-man-detained-ice-chongly-scott-thao/ [https://perma.cc/J33T-8C9T].
[7] *Id.*
[8] *Id.*
[9] *Id.*

6) The RCSO submitted a letter on February 24, 2026 to ICE Field Office Director Sam Olson requesting information related to the Thao incident. In response, a RCSO investigator was invited to meet with ICE Section Chief Howard Weisman, which took place on March 5. At that meeting, Weisman said that he was not authorized to share this information.

7) Because Weisman did not indicate who told him that he lacked authority to share the information, on March 20, 2026, the Office of the Ramsey County Attorney ("RCAO") made a formal demand for this information under the legal framework established by *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and DHS's implementing regulations governing agency responses to subpoenas, demands, and request for information.

8) DHS has requested more time to respond, but it has provided no information or reason for withholding information in the following almost four months.

9) Historically, and up to January 2026, federal and state authorities have cooperated in criminal investigations and shared information promptly, including regarding actions of federal agents that may violate state criminal law. That cooperation was not merely customary, it reflected the structure of American federalism, with States retaining primary authority to investigate and enforce violations of their own criminal laws.

10) This shift from historical practices of cooperation is reflected in Surge related cases in Hennepin County, where federal officials initially agreed to cooperate, but then withdrew cooperation, even blocked crime scene access. It is the duty of local

4

officials, in this case the Plaintiffs, to investigate the possible commission of crimes under state law. Like all states, the State of Minnesota, through its agencies and divisions, has a well-established independent sovereign right and responsibility to the people of Minnesota to investigate possible violations of its criminal laws, including by agents of the federal government. They must gather evidence, evaluate the facts, and decide whether Minnesota criminal law was violated. It is a core attribute of state sovereignty—and a duty owed to the people of Minnesota—that such investigations be thorough and based on all relevant evidence. The possible offenses under investigation here include, but are not limited to, burglary, false imprisonment, and kidnapping.

11) Defendants' refusal to share evidence in this incident here did not arise from any case-specific investigative need. DHS's decision to delay and effectively ignore requests from Plaintiffs' officials represents an effort to impair state investigations contrary to Defendants' wishes and frustrate any resulting investigations and charging decisions.

12) Defendants' non-responsiveness to Plaintiffs' request, whether an adopted policy and practice or case-specific, has deprived state investigators of timely access to evidence in federal custody that is directly relevant to their investigations of potential violations of Minnesota criminal law.

13) Plaintiffs John Choi, in his capacity as Ramsey County Attorney; and Bob Fletcher, in his capacity as Ramsey County Sheriff, bring this action against the U.S. Department of Homeland Security to secure access to the evidence necessary to investigate this incident and to ensure that the State of Minnesota can fulfill its sovereign

5

duty to determine whether federal officers committed crimes within its jurisdiction.

14) Plaintiffs seek declaratory and injunctive relief to set aside Defendants' unlawful policy of noncooperation and their refusal to comply with the investigative demands of Minnesota authorities.

## JURISDICTION AND VENUE

15) This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. A substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

16) Plaintiff John J. Choi is the Ramsey County Attorney. In that capacity, he is vested with the power and authority of the State of Minnesota to bring all felony criminal cases in Ramsey County, Minnesota. *See* Minn. Stat. § 388.051. He brings this lawsuit in his official capacity.

17) Plaintiff Bob Fletcher is the Ramsey County Sheriff, which is an elected office leading a department of Ramsey County, Minnesota. He brings this lawsuit in his official capacity. The Ramsey County Sheriff has law enforcement authority throughout Ramsey County, which includes the duty of pursuing and apprehending all felons. *See* Minn. Stat. § 387.03.

18) Defendant U.S. Department of Homeland Security is a cabinet-level federal agency within the Executive Branch of the United States government. The Department of Homeland Security includes fifteen operational and support components, including U.S.

Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). Homeland Security Investigations ("HSI") is a subcomponent of ICE.

19)    Defendant Markwayne Mullin is the current Secretary of Homeland Security and is charged with the supervision and management of all decisions and actions of DHS. Defendant Mullin is sued in his official capacity.

## LEGAL BACKGROUND

I.    *The State's Sovereign Authority to Investigate and Prosecute Its Criminal Laws*

20)    Under the Constitution's system of federalism, the States possess primary sovereign authority to perform many "vital functions of modern government," even without explicit constitutional authorization. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 535–36 (2012). This general power of governing, entrusted to the States rather than to the Federal Government, is referred to as the "police power." *Id.* The Tenth Amendment has long been understood to protect the rights of states to exercise their police powers within their borders and to serve as a check on the Federal Government's power. *See, e.g.*, *id.* at 536; *United States v. Morrison*, 529 U.S. 598, 618–19 (2000).

21)    The authority to define, investigate, and prosecute criminal offenses lies at the core of those sovereign police powers. *See Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (observing that "State prosecutions . . . have their most ancient roots in an 'inherent sovereignty'" belonging to the State); *Heath v. Alabama*, 474 U.S. 82, 89 (1985) (holding that "each State's power to prosecute derives from its inherent sovereignty, preserved to it by the Tenth Amendment"). Indeed, the Supreme Court has recognized that there is "no better example of the police power, which the Founders denied the

7

National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618.

22)    Accordingly, the State of Minnesota has the authority and duty to investigate potential crimes committed within its jurisdiction and to gather evidence necessary to enforce its laws. Plaintiffs are each vested with core aspects of that State authority.

## II.    *Longstanding Cooperation Between Federal and State Authorities in Criminal Investigations*

23)    Consistent with these longstanding principles of federalism, cooperation and evidence-sharing between federal law enforcement and state and local authorities has long been a routine and crucial feature of criminal investigations in states, like Minnesota, where federal and state interests overlap. This intergovernmental cooperation allows federal investigators to conduct their important work, while simultaneously allowing state and local investigators to do the work required by Minnesota law.

24)    Historically, collaborative state and federal investigations have been the norm in federal officer–involved incidents. For example, after a deputy U.S. Marshal shot a suspect at a gas station in Saint Paul in November 2019, the Minnesota Bureau of Criminal Apprehension ("BCA") led the investigation into the use of force by the federal agents, while state prosecutors handled related criminal cases against the suspect. Similarly, in June 2021, after two members of a U.S. Marshals Service task force shot and killed a suspect in Minneapolis, the BCA led the investigation into this shooting, with cooperation of federal authorities.

25)    Cooperation has also been the typical practice in non-officer-involved cases

8

that implicate both state and federal interests. For example, federal and state authorities worked together following the murder and attempted murder of Minnesota state lawmakers in June 2025. There, BCA and FBI agents conducted joint witness and subject interviews, shared physical evidence and other information, and met regularly and jointly with prosecutors. This collaboration enabled both state and federal prosecutions, resulting in the suspect pleading guilty to federal charges. Upon announcing the suspect's indictment, the U.S. Attorney's Office for the District of Minnesota included several statements emphasizing the collaboration between federal, state, and local law enforcement partners.[10] State proceedings are still ongoing. Additionally, when a mass shooting occurred in August 2025 at the Church of the Annunciation in Minneapolis, federal and state investigators collaborated in the immediate aftermath. Minnesota authorities then completed that investigation, with assistance from federal officers as needed.

26)    Clearly, this cooperation goes both ways. Just as Minnesota authorities benefit from federal assistance, so do federal prosecutions benefit from the work and support of state and local investigators. For example, in September 2025, a collaborative effort to share evidence resulted in federal charges against a suspect alleged to have threatened a federal judge. When announcing the charges, the United States Attorney's Office for the District of Minnesota stated:

> This case is the result of an investigation conducted by the FBI, the Wayzata Police Department, and the Bureau of Criminal Apprehension, with

---

[10] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. of Minn., Vance Boelter Indicted for the Murders of Melissa and Mark Hortman, the Shootings of John and Yvette Hoffman, and the Attempted Shooting of Hope Hoffman (July 15, 2025), https://www.justice.gov/usao-mn/pr/vance-boelter-indicted-murders-melissa-and-mark-hortman-shootings-john-and-yvette-0 [https://perma.cc/6VRN-MDZH].

assistance from the United States Marshals Service. The U.S. Attorney's Office also thanks the Hennepin County Attorney's Office for its quick action and important partnership in this case.[11]

27) Another example includes the successful federal RICO prosecutions, which spanned from 2023 to the present, of over 50 alleged gang members in the Minneapolis area. Several local, state, and federal law enforcement agencies worked together to share information and evidence, as did prosecutors from both the U.S. Attorney's Office and the Hennepin County Attorney's Office, all with the purpose of supporting the federal prosecutions.[12]

28) An additional example pertains to the U.S. Attorney's Office's announcement of a guilty plea secured in a violent attempted armed robbery case that occurred in Saint Paul in January 2017. This case was investigated by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the St. Paul Police Department, and the Metro Transit Police, with assistance provided by RCAO. ATF Special Agent in Charge James Modzelewski of the St. Paul Field Division described the investigation as "a perfect example of how intelligence solves crimes," emphasizing the "great collaboration" from the St. Paul Police Department, Metro Transit Police, RCAO, the U.S. Attorney's Office and the ATF.[13]

29) This collaboration is further evidenced by the U.S. Attorney's Office for the

---

[11] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. of Minn., Defendant Charged with Threatening to Murder a Federal Judge (Sept. 9, 2025), https://www.justice.gov/usao-mn/pr/defendant-charged-threatening-murder-federal-judge [perma.cc/QGR6-EPE8].

[12] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. of Minn., Three Members of the Highs Street Gang Convicted of RICO Conspiracy and Premeditated Murder (April 23, 2025), https://www.justice.gov/usao-mn/pr/three-members-highs-street-gangconvicted-rico-conspiracy-and-premeditated-murder. [https://perma.cc/M3JD-8YNX].

[13] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. Of Minn., St. Paul Man Pleads Guilty To Attempted Armed Robbery Of Convenience Store (Aug. 9, 2017), https://www.justice.gov/usao-mn/pr/st-paul-man-pleads-guilty-attempted-armed-robbery-convenience-store [https://perma.cc/N9KH-PZBH].

District of Minnesota's 2022 federal violent crime strategy to expand capacity to prosecute violent crime cases. Through this joint law enforcement operation, 15 individuals were arrested, and 32 illegal firearms were seized. This operation included over 100 federal, state, and local law enforcement officers and was led by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Federal Bureau of Investigation, Drug Enforcement Administration, Homeland Security Investigations, the U.S. Marshals Service, the BCA, the Hennepin County Sheriff's Violent Offender Task Force, the Minneapolis Police Department, the Ramsey County Sheriff's Office, and the St. Paul Police Department.[14]

30)    Additionally, federal investigators routinely contribute to state-led investigations and operations. For example, Operation Safe Summer is a long-lasting collaboration between several state and federal law enforcement agencies that has led to many successful state-level prosecutions.[15] Further, state and federal law enforcement agencies collaborate on the Behavioral Threat Assessment and Management ("BTAM") team, an evidence-based and systematic process to identify, inquire, assess, and manage potential threats.[16] The BTAM collaboration has resulted in many successful state-level law enforcement actions and prosecutions.

31)    In the context of potential federal officer-involved violence that occurs

---

[14] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. Of Minn., U.S. Attorney Announces Recent Law Enforcement Actions as Part of Federal Violent Crime Strategy (Aug. 19, 2022), https://www.justice.gov/usao-mn/pr/us-attorney-announces-recent-law-enforcement-actions-part-federal-violent-crime-strategy [https://perma.cc/2AHE-5M88].
[15] *See* Louis Krauss, Agencies again team up in Minneapolis to Saturate Crime Hot Spots for "Operation Safe Summer," MINN. STAR TRIB. (June 4, 2025), https://www.startribune.com/agencies-again-team-up-in-minneapolis-to-saturate-crime-hot-spots-for-operation-safe-summer/601366596 [perma.cc/6RZ7-H7G9].
[16]    *See* U.S. Dep't. of Homeland Security, Behavioral Threat Assessment and Management, https://www.dhs.gov/behavioral-threat-assessment-and-management [https://perma.cc/WZ9E-WXWY].

within Minnesota's borders, this cooperation and evidence-sharing is particularly important. To determine whether the alleged conduct violates Minnesota criminal law, state and local authorities must obtain access to relevant witnesses, documents, and physical evidence—including from the federal government—in order to conduct a thorough investigation. Local authorities' ability to obtain such evidence—including evidence in the possession of federal agencies—is an essential component of the State's sovereign authority to investigate crimes and enforce its criminal laws.

32)    Plaintiffs are well-equipped to handle sensitive investigative materials, including those shared by federal law enforcement. Investigators within the RCSO and the RCAO conduct secure and careful investigations into serious incidents every day, including those involving law enforcement officers. They maintain appropriate safeguards for sensitive information, follow chain-of-custody procedures, and preserve evidence for potential use in criminal proceedings. Furthermore, the Minnesota Government Data Practices Act classifies data related to open investigations as nonpublic. Minn. Stat. § 13.82, Subd. 7. This statute also establishes protections in instances where witnesses have legitimate fears for their safety. As such, there can be no legitimate concern that sharing evidence with RCAO and the Ramsey County Sheriff's Office will compromise any federal investigation. Indeed, the federal government has routinely shared evidence with Minnesota state and local authorities in cooperative investigations.

33)    The longstanding practice of cooperation and evidence-sharing between federal and state law enforcement authorities deteriorated during DHS's Operation Metro Surge in Minnesota. The history of cooperation and access to federal evidence that

Minnesota officials have long relied on to investigate violent conduct abruptly ended once federal leadership became involved. Relating to shootings by federal officers in Minneapolis, Defendants have repeatedly failed to share information with the State regarding the shootings of Renee Good, Alex Pretti, and Julio Cesar Sosa-Celis. Defendants have since repeatedly declined to provide Ramsey County law enforcement access to evidence germane to the investigations into the forcible entry into Mr. Thao's Saint Paul home and his subsequent detention. These events evidence a significant breakdown in the longstanding practice of cooperation between federal and state authorities in investigations involving potential criminal conduct within Minnesota, including the conduct of federal officers.

### III.    *Defendants'* Touhy *Regulations Governing Formal Requests for Agency Records and Testimony*

34)    Several federal agencies, including DHS, have promulgated regulations governing requests for testimony or documents for use in litigation or investigations in which the agency is not a party. These regulations—commonly known as "*Touhy* regulations" after the Supreme Court decision, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), that recognized their general validity—were promulgated under authority derived from the Federal Housekeeping Act, 5 U.S.C. § 301.

35)    The Federal Housekeeping Act authorizes federal agencies to establish procedures governing how requests for testimony or records are handled internally, but does not create independent authority to withhold information. *See* 5 U.S.C. § 301 ("This section does not authorize withholding information from the public or limiting the availability of records to the public."); 9 *Moore's Federal Practice* § 45.05[1][b] (3d ed.

2026) ("[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a [legal demand], the legal basis for any opposition to the [legal demand] must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.").

36)     Typically, *Touhy* regulations require that requests for testimony or records be directed to designated agency officials and establish procedures for determining whether disclosure will be authorized. Such regulations' primary purpose is to centralize agency decision-making concerning the disclosure of official information, to ensure consistency in responses, and to prevent unauthorized disclosures by employees.

37)     *Touhy* regulations generally identify the factors that agency officials should consider in evaluating legal demands. These factors may include the applicability of relevant legal protections—such as privileges, confidentiality interests, or law enforcement sensitivities—and the need for appropriate disclosure notwithstanding these legal protections. However, the statutory authority governing these regulations specifically states that "[t]his section does not authorize withholding information from the public or limiting the availability of records to the public." *See* 5 U.S.C. § 301.

38)     After federal officials stated they would not share evidence with State authorities due to lack of authorization, Plaintiffs submitted a formal request via Defendants' *Touhy* procedures.

### a. *Touhy* Regulations Generally

39)     State and local governmental entities, such as law enforcement agencies and regulatory authorities, frequently require testimony, records, and other evidence from

federal agencies in connection with criminal investigations, enforcement actions, and judicial proceedings. Generally, in the absence of voluntary law-enforcement-to-law-enforcement disclosure, *Touhy* requests constitute the mechanism through which state and local authorities may request testimony or records from federal agencies or federal employees for use in legal proceedings. Typically, federal agencies require that these requests be submitted through the procedures established by their *Touhy* regulations rather than through direct service of subpoenas on federal personnel or agencies. *See, e.g.*, *In re Elko Cnty. Grand Jury*, 109 F.3d 554, 555-56 (9th Cir. 1997) (holding that a "state court lacked jurisdiction to issue [a grand jury] subpoena" to a federal agency); *Houston Bus. J., Inc. v. OCC*, 86 F.3d 1208, 1213 (D.C. Cir. 1996) ("When the documents are sought from a federal agency . . . , the proper procedure is to make an administrative request, from which review may be had under the APA.").

40)    A *Touhy* demand differs from a request for government records submitted under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and operates under a materially different disclosure framework. Under FOIA, records released are effectively disclosed to any member of the public without restriction. Additionally, the requestor's need for the information cannot overcome the applicability of a qualified privilege (e.g., for law enforcement techniques and procedures). By contrast, *Touhy* requests arise in connection with specific litigation or investigations, and the applicable regulations generally require agencies to evaluate privileges and confidentiality interests in light of the requestor's specified need for the information, including by authorizing disclosure subject to protective orders or other confidentiality conditions.

41)    As described below, Defendants have essentially ignored Plaintiffs' *Touhy* requests seeking disclosure of records and testimony relevant to evaluating the federal-officer-involved home entry and taking of Mr. Thao that occurred in Minnesota in January 2026.

### b.  DHS's *Touhy* Regulations

42)    DHS *Touhy* regulations expressly provide that voluntary disclosure of information to state and local law enforcement and prosecutorial agencies is permitted in conjunction with criminal law enforcement investigations and prosecutions, without needing to comply with the procedural requirements of the agency's *Touhy* regulations. *See* 6 C.F.R. § 5.41(i) ("Nothing in this subpart affects the disclosure of official information . . . to federal, state, local or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings"); *see also* 19 C.F.R. § 103.21(e) (CBP's *Touhy* regulations similarly state that they are not meant to impede the "appropriate disclosure" of information to state and local law enforcement authorities). This does not prevent DHS from considering demands from state and local law enforcement under its *Touhy* regulations.

43)    Additional language in 6 C.F.R. § 5.41 confirms that DHS's *Touhy* regulations do not provide lawful justification for refusing to process Ramsey County's demand. For instance, § 5.41(d) states that the regulations apply to "all pre-trial, trial, and post-trial stages of all judicial or administrative actions, hearings, *investigations*, or similar proceedings before courts, commissions, boards . . . , grand juries, or other judicial or quasi-judicial bodies or tribunals, whether *criminal*, civil, or administrative in nature"

16

(emphasis added). Any interpretation that DHS's regulations nullify the *Touhy* regulatory framework where state and local law enforcement authorities seek evidence in connection with criminal investigations is implausible and unsupported by the regulations and their purpose.

44)    Where voluntary disclosure to state and local law enforcement is not made, and where a formal *Touhy* request is issued, DHS's *Touhy* regulations direct officials and attorneys to consider several factors, including the public interest; whether disclosure would be consistent with DHS's mission and duties; the need to avoid spending the time and money of the United States for private purposes; and whether the information is otherwise protected by privilege or confidentiality obligations. *See* 6 C.F.R. § 5.48.

**FACTUAL ALLEGATIONS**

45)    Starting in late 2025 the Trump Administration initiated Operation Metro Surge, a large-scale immigration enforcement initiative, in late 2025. During Operation Metro Surge, the federal government deployed thousands of federal officers from agencies including ICE and CBP to conduct immigration enforcement activities in Minnesota. Executed without coordination with state and local authorities, this operation represented an unprecedented concentration of federal immigration personnel.

46)    During Operation Metro Surge, federal officers departed from longstanding law enforcement practices by frequently concealing their identities with masks. Masking both conceals agents' identities from the public and makes it difficult for state and local investigators, in the absence of federal cooperation, to identify agents involved in potentially unlawful incidents. That federal officers intentionally concealed their

identities evidences the need for Plaintiffs to access investigative material relating to the forcible home entry and detention of Mr. Thao by federal agents during Operation Metro Surge.

47)    DHS and ICE officers in Operation Metro Surge have also sought to conceal the identity of their cars by using unmarked cars, often with missing, obscured, altered, or switched plates. As with masking, this practice of switching or otherwise obscuring license plates serves to conceal agents' identities from the public and makes it nearly impossible for state and local authorities to identify agents potentially involved in criminal investigations without federal cooperation. Numerous incidents of federal vehicles with suspicious plate activity have been identified, such as one license plate being observed on four different vehicles, expired tabs, or plates being registered to a nonexistent business.[17]

## I.    *Forcible entry into ChongLy "Scott" Thao's home and his detainment*

48)    On the afternoon of January 18, 2026, several masked and armed individuals with guns drawn, who appeared to be federal agents, broke into the Saint Paul, Ramsey County home of ChongLy "Scott" Thao, a U.S. citizen.[18] Mr. Thao was handcuffed and removed from his home, without his consent, wearing a pair of blue shorts, Crocs, and a baby blanket over his shoulders.[19] The masked and armed individuals ignored Thao's request to put on warmer clothes before they took him out of the home,

---

[17] *See* Jana Hollingsworth, Swapped, covered and removed: The license plate tactics ICE is using in Minnesota, MINN. STAR TRIB. (Feb. 6, 2026), https://www.startribune.com/swapped-covered-and-removed-the-license-plate-tactics-ice-is-using-in-minnesota/601573065 [https://perma.cc/W5GF-3AHT]; Jon Collins, Minnesota DVS warns ICE agents they're violating state law by switching license plates, MPR NEWS (Dec. 25, 2025), https://www.mprnews.org/story/2025/12/24/ice-agents-in-minnesota-are-violating-state-law-by-switching-license-plates [https://perma.cc/F8FQ-FESR].

[18] *See* Vue, *supra* note 6.

[19] *Id.*

18

without his consent, into 10-degree temperatures. Images of a half-naked Mr. Thao being escorted to a vehicle driven by the masked individuals have been widely shared on social media and news stories.[20] He was then driven around in a vehicle, questioned, and identified for about one hour until they returned him to his home.

49)     The RCSO opened a criminal investigation under State law into this incident. Investigators were able to obtain vehicle plate information of the individuals who took Mr. Thao from his home, only to also find that those plates had been used on multiple vehicles. This reflected the demonstrated pattern and practice of DHS and ICE officials intentionally switching or otherwise obscuring license plates serves to conceal agents' identities from the public.

50)     Based on this information and other publicly available information about Operation Metro Surge, it is presumed that the individuals involved were officers of one or more DHS agencies. There is no indication the officers had a warrant for entry or arrest.

II.    ***Federal Policy and Practice of Declining to Share Investigative Evidence in Operation Metro Surge Use-of-Force Investigations***

51)     After the fatal shootings of Nicole Good and Alex Pretti, and the non-fatal shooting of Julio Cesar Sosa-Celi, the State and Hennepin County made a *Touhy* request to the U.S. Department of Justice ("DOJ") and DHS to seek access to evidence in those cases. *State of Minnesota et al. v. U.S Department of Justice et al.*, No. 1:26-cv-01007, (D.D.C. June 18, 2026), ECF No. 17 (Am. Compl.), ¶ 10. As in this case, the federal government had, up until very recently, refused these requests. *Id.*, ¶ 11.

---

[20] *Id.*

52) Defendants' responses to State and Hennepin County officials following federal officer involved shootings indicate a policy or practice of not sharing information regarding federal officer involved incidents, with the aim of hampering the State's ability to investigate and, if appropriate, prosecute the cases. Requests were ignored. For instance, public statements from high-ranking federal officials confirmed that there would be no federal cooperation with the BCA's investigation into Ms. Good's death.[21] In Ms. Good's case, then DHS Secretary Kristi Noem incorrectly asserted that, "[t]hey [the State of Minnesota] don't have any jurisdiction in this investigation."[22] President Trump stated that there would be no federal cooperation because Minnesota officials were "crooked."[23]

53) This policy or practice of not sharing information with state officials, as evidenced by Defendants' responses to State and Hennepin County officials regarding the federal officer involved shootings in Minneapolis, appears to be similarly applied by Defendants to Ramsey County officials. Defendants have told RCSO that they are not authorized to share information about the Thao incident and are not responsive to inquiries about which officials are authorized to share this information.

54) Nevertheless, the Ramsey County Attorney and the Ramsey County Sheriff, with the power and authority vested in them by the State of Minnesota, have an

---

[21] *See* Sydney Kashiwagi, *Justice Department Says It Has No Plans to Investigate ICE Agent Who Killed Renee Good and Confirms Walz, Frey probe*, MINN. STAR TRIB. (Jan. 18, 2026), https://www.startribune.com/justice-department-says-it-has-no-plans-to-investigate-ice-agent-who-killed-renee-good-and-confirms-walz-frey-probe/601566499 [https://perma.cc/69G2-3V2R].

[22] Caroline Cummings, *Minnesota AG, Hennepin Co. Vow to Still Collect Evidence in ICE Shooting After State Authorities Shut Out of Federal Investigation*, CBS MINN. (Jan. 9, 2026), https://www.cbsnews.com/minnesota/news/minnesota-ice-shooting-hennepin-county-collects-evidence-investigation/ [https://perma.cc/WX6S-38QE].

[23] Willa Pope Robbins, *Trump Says He's Freezing Minnesota Officials Out of ICE Shooting Probe Because Tim Walz Is 'A Stupid Person,'* MEDIATE - YAHOO NEWS (Jan. 9, 2026), https://www.yahoo.com/news/articles/trump-says-freezing-minnesota-officials-230604582.html [https://perma.cc/UD37-YRHC].

independent sovereign prerogative and responsibility to investigate the forcible home entry and detention of Mr. Thao for possible violations of Minnesota's own criminal laws.

55)    Consistent with that sovereign responsibility, Ramsey County officials are conducting an investigation into the detention of Mr. Thao. The RCSO is leading this investigation, and the RCAO will be responsible for determining whether to bring any charges after considering the available evidence. The RCAO has not yet determined whether probable cause exists to prosecute charges for a violation of state law.

### III.    *Plaintiffs' Formal* Touhy *Demand to DHS*

56)    As part of its investigation of this incident, the RCSO sent a letter on February 24, 2026 to ICE Saint Paul Field Office Director Sam Olson requesting information related to the incident. A true and correct copy of that letter is attached as Exhibit 1.

57)    In response, an RCSO investigator was invited to meet with ICE. Section Chief Howard Weisman, and that meeting took place on March 5, 2026. Section Chief Weisman said that he was not authorized to share this information. He did not say who did have that authority.

58)    After being unable to obtain investigative materials through the above-referenced request to local DHS officials On March 20, 2026, the RCAO submitted a formal *Touhy* demand to DHS for information relevant to the investigation. Based on the urgency of the need for the requested documents and testimony, as explained further below, and the fact that it appeared that federal authorities had already decided not to share evidence with State authorities, the RCAO requested initial responses from DHS by

April 30, 2026. A true and correct copy of that demand letter is attached as Exhibit 2.

59)    In the demand letter, the RCAO explained the specific needs for the information. Specifically, the letter noted that the requested information

> bears on the pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. The information will allow us to determine who was involved, what exactly occurred, under what authority those involved were acting or believed they were acting, and to begin to assess whether their actions were necessary and proper.

60)    The demand letter also explained the need for information being time sensitive.

61)    Plaintiffs also explained in their *Touhy* demand letter that prompt disclosure of the requested evidence is important to ensure compliance with United States and Minnesota law. Such law includes the right of the accused to due process and the Minnesota statute of limitations. *See generally State v. Banks*, 875 N.W.2d 338 (Minn. Ct. App. 2016) (holding that the district court's ability to dismiss a complaint if the prosecutor has unnecessarily delayed bringing the defendant to trial also applies to pre-charge delay claims); *see also* Minn. R. Crim. P. 30.02, Minn. Stat. Ann. § 628.26. Minnesota law also provides crime victims with the rights of notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

62)    The demand letter was sent by certified mail to the Office of General Counsel of DHS in Washington, D.C., with copies to sub-agencies of DHS and the Minnesota U.S. Attorney's Office. It was also sent by email to the Office of the General Counsel and, as a courtesy, to officials within DOJ's Civil Division responsible for coordinating the federal government's response to *Touhy* demands.

**IV.**    ***Defendants' Response to Plaintiffs' Touhy Request***

63)    On April 28, 2026, the RCAO received an email from Ryan Stubs, Senior Counsel, Government Information Law Division, Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. It read, in part: "ICE is still in the process of evaluating your request. I am seeking a two-week extension until May 15, 2026, which should give us enough time to complete our response." The RCAO responded, granting the extension.

64)    On May 15, the RCAO received an email Mr. Stubbs stating, "ICE is still in the process of evaluating your request. We will provide our response as soon as possible. Thank you for your understanding." The RCAO responded by stating, "We believe you have had ample time to provide much if not all of the information requested, but will extend our request until May 29, 2026, at the end of business."

65)    To date the RCAO has received no additional communication from Mr. Stubbs nor from anyone else at DHS.

66)    A true and correct copy of the above exchange is attached as Exhibit 3.

67)    DHS has not identified any lawful justification for their refusal to share information with Plaintiffs related to the detention of Mr. Thao. Nor has DHS provided a lawful basis for breaking the longstanding practice of state-federal cooperation and sharing evidence. The principles of federalism do not enable the federal government to withhold investigative evidence for the purpose of concealing law enforcement officers from scrutiny where a State is investigating serious potential violations of its criminal laws within its jurisdiction.

## CAUSES OF ACTION

### COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious, Not in Accordance with Law, in Excess of Statutory Authority

68)     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

69)     The Administrative Procedure Act ("APA") provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

70)     Agency action includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 60 (2004) (emphasis in original) (citing 5 U.S.C. § 551(13)).

71)     When a delay in agency action inflicts "such impairment on a party's rights as to amount to a violation of a legal right, it may be considered 'final action' subject to judicial review." 2 Am. Jur. 2d *Administrative Law* § 408 (2026); *see also Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Nat'l Mediation Bd.*, 425 F2d 527, 535 n.3 (D.C. Cir. 1970). A federal agency's failure to act can constitute "final" agency action if the agency: (1) "affirmatively rejects a proposed course of action;" (2) "delays unreasonably in responding to a request for action; or" (3) "delays in responding until the requested action would be ineffective." 2 Am. Jur. 2d *Administrative Law* § 408 (2026) (citing *Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003)).

72)     Since May 15, 2026, DHS has not responded to Plaintiffs' *Touhy* requests seeking investigative materials and testimony relating to the officer-involved detainment of Mr. Thao, despite the passage of the deadlines identified in those requests (April 30, May 15, and May 29). DHS has not sought an extension of the May 29, 2026 deadline specified in the most recent demand.

73)     This unreasonable delay has appreciable legal consequences for Plaintiff. Minnesota state law has vested the responsibility to protect against and address violence within its borders in Ramsey County officials, to gather the evidence, evaluate the facts, and decide whether Minnesota criminal law was violated. Without federal cooperation, Ramsey County officials are unable to fulfill this duty owed to the people of Ramsey County.

74)     The Department of Homeland's Security's silence with respect to Plaintiffs' *Touhy* demand constitutes final agency action within the meaning of the APA, because (1) this unreasonable delay impairs Plaintiffs' rights to investigate serious potential violations of its criminal laws within its borders, and (2) represents the agency's definitive position that the *Touhy* regulations to not apply to demands for evidence for use in criminal investigations.

75)     To determine whether Defendants' exercise of discretion under the "arbitrary and capricious" standard, courts apply a "narrow" scope of review and determine where the agency "examined 'the relevant data' and articulated 'a satisfactory explanation' for his decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

76)     DHS has not articulated a "satisfactory explanation" for their decision to ignore Plaintiffs' *Touhy* requests. In ignoring Plaintiffs' *Touhy* requests, DHS has not identified any lawful basis for withholding the material sought by Plaintiffs in the demand related to the Thao matter. Through their silence, DHS has not asserted that disclosure of the materials sought would reveal privileged information, compromise investigative techniques, interfere with an ongoing investigation, divert agency resources for private purposes, or otherwise implicate any factor that could justify withholding under DHS's regulations.

77)     The Department of Homeland Security's delay in responding to Plaintiffs and providing evidence in the Thao matter is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

78)     DHS's actions also exceed the authority conferred by the Federal Housekeeping Act, which permits agencies to establish procedures governing the disclosure of records but does not authorize agencies to withhold information or decline to evaluate disclosure requests absent a lawful basis.

79)     DHS lacks a lawful basis to refuse to process and comply with the *Touhy* demand and to refuse to disclose the requested materials for use in connection with Plaintiffs' criminal investigation of the Thao forcible entry and detention.

## COUNT II
### Administrative Procedure Act, 5 U.S.C. § 706(1)
### Unlawfully Withheld and Unreasonably Delayed Agency Action
### *Pled in the Alternative*

80)     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

81)     To the extent the Court concludes that the Department of Homeland Security's policy or practice of ignoring responses to evidence requests in state investigations does not constitute final agency action on which Plaintiffs are entitled to immediate judicial review, Plaintiffs seek relief under the APA for agency action unlawfully withheld or unreasonably delayed.

82)     The APA provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

83)     DHS has not responded to Plaintiffs' *Touhy* requests seeking investigative materials and testimony relating to the federal-officer-involved forcible entry and detainment of Mr. Thao, despite the passage of the deadlines identified in those requests (April 30, May 15, and May 29). DHS's regulations require responsible officials to evaluate such *Touhy* demand and determine whether disclosure will be authorized after consideration of the factors set forth in those regulations. *See* 6 C.F.R. § 5.48. By failing to issue any determination regarding this demand, DHS has unlawfully withheld agency action that the regulations require the Department to take.

84)     In the alternative, DHS's failure to act on Plaintiffs' *Touhy* demand constitutes an unreasonable delay in agency action. Plaintiffs' requests to seek information necessary for Ramsey County to complete ongoing criminal investigations,

and they set forth in detail the urgency with which the evidence is needed to promptly determine whether violations of Minnesota law occurred. It is plainly unreasonable for DHS to continuously delay and ignore such a request.

85) Plaintiffs requested that the Department of Homeland Security provide at least an initial response to Plaintiffs' request within forty-one days (thirty working days) of the date of the demand. Given the urgent need for the requested information in connection with ongoing criminal investigations, that timeframe was reasonable for purposes of acknowledging the requests and indicating whether the Department would authorize disclosure, even if additional time might ultimately be required to coordinate the logistics of producing records or arranging testimony. Comparable federal criminal procedures often operate on similar or even shorter timelines. For example, federal courts frequently require compliance with federal grand jury subpoenas within fourteen days, even where those subpoenas seek substantial records from third parties.

86) Similarly, FOIA, which governs requests for government records from the general public for any purpose, requires federal agencies to make an initial determination regarding disclosure within twenty working days. In contrast to FOIA requests, the requests here were submitted by local law enforcement authorities to allow them to satisfy core sovereign responsibilities, and they were targeted to a discrete and readily identifiable body of evidence. Even when measured against the longer FOIA standard, the response period has clearly expired for Plaintiffs' request, and DHS has neither provided a written determination nor sought additional time to do so.

87) Therefore, DHS's failure to process or decide Plaintiffs' requests

28

constitutes agency action unlawfully withheld or unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

## COUNT III
## TENTH AMENDMENT

88) Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

89) Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

90) The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *See Printz v. United States*, 521 U.S. 898, 935 (1997).

91) Under our nation's system of federalism, policing and crime control constitute some of the most basic rights reserved to States and their municipalities. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618. "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878).

92) State and local control of law enforcement is fundamental to the protection of liberty, federalism, and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing

that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *NFIB*, 567 U.S. at 536 (quoting The Federalist No. 45, at 293 (J. Madison)).

93)     Defendants' actions to prevent state and local investigators from accessing evidence critical to ongoing criminal investigations into potential violations of Minnesota law violates Plaintiffs' core sovereign interests in investigating and enforcing Minnesota criminal law.

94)     Plaintiffs are entitled to a declaration that the Defendants' policy or practice violates the Tenth Amendment and an injunction that prohibits Defendants from unduly delaying and preventing access to evidence critical to their investigations into potential violations of Minnesota criminal law.

## PRAYER FOR RELIEF

WHEREFORE, good cause having been shown, Plaintiffs respectfully pray that the Court:

1. Declare that Defendants' policy or practice of declining to share investigative materials with Minnesota authorities concerning the federal officer–involved use of force arising out of Operation Metro Surge is arbitrary, capricious, not in accordance with law, and in excess of statutory authority within the meaning of the APA;

2. Set aside and vacate that unlawful policy or practice;

3.  Declare that the decision of the U.S. Department of Homeland Security refusing to process or grant Plaintiffs' *Touhy* request in the Thao matter is arbitrary, capricious, not in accordance with law, and in excess of statutory authority;

4.  Order the Defendants to comply with Plaintiffs' *Touhy* request by providing Plaintiffs with access to the requested testimony, records, and other evidence requested in connection with the Thao matter.

5.  In the alternative, remand Plaintiffs' *Touhy* requests to Defendants with instructions to evaluate those requests promptly and in good faith under the applicable *Touhy* regulations and consistent with this Court's order;

6.  Declare that Defendants' actions violate the Tenth Amendment of the U.S. Constitution;

7.  Order Defendants to provide Plaintiffs access to evidence and investigative materials in the Thao forcible entry and detention to remedy Defendants' Tenth Amendment violations;

8.  Award costs and reasonable attorneys' fees incurred in this action to the extent permitted by law; and

9.  Grant such other relief as the Court may deem just and proper.

**JOHN J. CHOI**
**RAMSEY COUNTY ATTORNEY**

Dated:  July 15, 2026

By: */s/ Mark Haase*
　　　Mark Haase (#0386726)
Hao Nguyen (#0391385)
Brett Bacon (#0400776)
Assistant County Attorneys
360 Wabasha St. N., Suite 100
St. Paul, MN 55101
651-266-3196 (Haase)
651-266-3152 (Nguyen)
651-627-5473 (Bacon)
mark.haase@ramseycountymn.gov
hao.nguyen@ramseycountymn.gov
brett.bacon@ramseycountymn.gov

*Attorneys for Plaintiffs*