**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

John Choi, et al.,

Plaintiffs,

v.

U.S. Department of Homeland Security, et al.,

Defendants.

Court File No.: 0:26-CV-03301-ECT-ECW

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

## INTRODUCTION

During the federal government's Operation Metro Surge, in the frigid days of January 2026, armed and masked individuals stormed the Saint Paul home of U.S. citizen Chongly "Scott" Thao. According to news accounts of the incident, these masked and armed individuals, presumably federal agents, used a battering ram to force their way into Mr. Thao's home without identifying themselves or presenting a judicial warrant to enter the home. They then forced Mr. Thao out into 10-degree weather wearing only blue shorts and Crocs with a small blanket draped over his shoulders. They then drove Mr. Thao around for about an hour without telling him where they were going, then dropped Mr. Thao off back at his home without further explanation.

The Ramsey County Attorney's Office (RCAO) and Sheriff's Office (RCSO), who are mandated by Minnesota law to enforce state criminal law within its borders, have begun an investigation into whether these masked and armed individuals, presumably federal

agents, violated Minnesota law. As part of that investigation, the RCAO and RCSO sent requests to Immigration and Customs Enforcement (ICE), which is a component of the U.S. Department of Homeland Security (DHS), seeking information such as the identity of agents involved in the raid on Mr. Thao's home, the agency's polices and directive about home entry, and related documentation and information. These sort of requests have traditionally been uncontroversial. But when DHS did not respond to these requests, Plaintiffs filed this instant action. When DHS thereafter formally denied these requests with virtually non-existent reasoning for doing so, Plaintiff filed an Amended Complaint.

Plaintiffs ask the Court to order Defendants to comply with their own regulations and produce information relevant to the incident. Defendants have been ignoring what is required of them by their own regulations in an apparent attempt to obstruct Plaintiffs' investigation into possible violations of state law. In doing so, Defendants offer contrived and nonsensical defenses that are contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act (APA). The result of Defendants' obstruction is to interfere with Ramsey County's inviolable sovereign power to enforce its criminal code, which violates the Tenth Amendment. Therefore, the Court should grant summary judgment in Plaintiffs' favor and deny Defendants' motion to dismiss.

## BACKGROUND

### I. Longstanding Cooperation Between Federal and State Authorities in Criminal Investigations

#### A. *Minnesota's Sovereign Investigative Responsibilities and the Longstanding Practice of Federal-State Evidence Sharing*

Under our system of federalism, states exercise criminal enforcement authority with "ancient roots in an 'inherent sovereignty'" that predates the Constitution and is preserved within it. *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (quoting *Heath v. Alabama*, 474 U.S. 82, 89 (1985)). "Prior to forming the Union, the States possessed 'separate and independent sources of power and authority,' which they continue to draw upon in enacting and enforcing criminal laws." *Id.* (quoting *Heath*, 474 U.S. at 89). The states—not the federal government—retain primary sovereign authority to define and enforce criminal law through their police powers, of which there is "no better example" "than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). The state's power to define and enforce criminal law extends to the prosecution of federal officials who violate state criminal law while acting in their capacity as federal officials. *See, e.g., Mesa v. California*, 489 U.S. 121 (1989) (postal service employee charged for violation of state criminal law.

In Minnesota, state and local officials, including Plaintiffs, exercise this core sovereign power by investigating violent crime and enforcing Minnesota criminal law. The Ramsey County Attorney's Office (RCAO) is vested with the power to prosecute felonies in Ramsey County. Minn. Stat. § 388.051, subd. 3. Likewise, the Ramsey County Sheriff's

Office (RCSO) has the power to, *inter alia*, "pursue and apprehend all felons." Minn. Stat. § 387.03.

Consistent with these federalism principles, cooperation and evidence sharing between federal, state, and local law enforcement has long been a routine and essential feature of criminal investigations in Minnesota. Decl. of Drew Evans (Evans Decl.), ¶¶ 7-9. Intergovernmental cooperation allows federal investigators to conduct their important work, while allowing state and local investigators to do the work that the people of Minnesota require of them. *Id.*, ¶ 7. For example, federal and state authorities cooperated after the murder and attempted murder of Minnesota state lawmakers in 2025. *Id.*, ¶ 8. The Minnesota Bureau of Criminal Apprehension (BCA) and FBI agents conducted joint witness and subject interviews, shared physical evidence and other information, and met regularly and jointly with federal and state prosecutors. *Id.* This collaboration led to ongoing state and federal prosecutions. *Id.* As another example, federal and state investigators collaborated in the immediate aftermath of a mass shooting at the Church of the Annunciation in Minneapolis in August 2025. *Id.* Minnesota authorities then completed the investigation with assistance from federal officers as needed. *Id.*

Such cooperation likewise has been the practice in federal officer-involved shootings. *Id.*, ¶ 9. For example, in November 2019, after a Deputy U.S. Marshal shot a suspect in St. Paul, the BCA led the investigation into federal agents' use of force, and state prosecutors handled related criminal cases against the suspect. *Id.* Similarly, in June 2021, after two members of a U.S. Marshal's task force shot and killed a suspect in Minneapolis, the BCA led the investigation into this shooting, with the support and cooperation of federal

authorities. *Id*. Indeed, Immigration and Customs Enforcement's (ICE's) Handbook on Use of Force contemplates state and local law enforcement investigation into its employees' use of force, acknowledging that "Local, State, Tribal, and Federal law enforcement agencies may investigate use of force incidents occurring within their jurisdictions, including those resulting in serious bodily injury or death of an individual (critical incidents)." ICE, Use of Force Handbook, Chapter 4, (Sept. 15, 2025), https://perma.cc/ZGB7-CZUV. It therefore directs "ICE employees involved in a critical incident" to "anticipate an investigation by other appropriate outside law enforcement agencies," including being required to submit to law enforcement interviews. *Id*[1].

Thus, until this year, it was essentially a given that Minnesota and federal law enforcement would work collaboratively on parallel investigations, including by sharing evidence. Evans Decl., ¶¶ 7-8. Indeed, in all other matters, including complex homicide cases, drug and gun cases, and many other types of cases, collaboration and information sharing between the RCSO, RCAO, BCA, and federal officials continues as normal. Decl. of John Choi (Choi Decl.), ¶ 20.

***B. The Framework Governing Requests for Evidence from Federal Agencies***

State authorities request and obtain evidence from federal authorities based on longstanding intergovernmental practice, as discussed above, and through the legal framework governing evidentiary demands directed to the United States and its agencies, as discussed below. *Id.*

[1] The quotes to this chapter can be found on pdf page 73 of the linked pdf document.

Many federal agencies, including DHS, have promulgated regulations governing requests for information for use in litigation or investigations in which the agency is not a party. These regulations—commonly known as "*Touhy* regulations," after *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)—were promulgated under the Federal Housekeeping Act, 5 U.S.C. § 301 et seq. *Touhy* regulations typically require that requests for testimony or records be directed to designated officials and establish procedures for those officials to determine whether to authorize disclosure. *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1051 (8th Cir. 2007). The Housekeeping Act, however, "does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301.[2] An agency must have an independent authority to withhold information. *See Upsher-Smith Laboratories, Inc. v. Fifth Third Bank*, No. 16-cv-556, 2017 WL 7369881, at *8 (D. Minn. Oct. 18, 2017); *see also Watts v. SEC*, 482 F.3d 501, 508-09 (D.C. Cir. 2007) (agency's *Touhy* regulations did not "authorize withholding information from the public or limiting the availability of records to the public").

Many agencies, including DHS, expressly permit officials to disclose information to state and local law enforcement in conjunction with criminal law enforcement investigations and prosecutions *without* needing to comply with the agency's *Touhy* regulations. *See* 28 C.F.R. § 16.21(c) (Department of Justice); 6 C.F.R. § 5.41(i) (DHS); 19

[2] Following the Supreme Court's decision in *Touhy*, Congress added this sentence to the Housekeeping stop agencies from using the Act to withhold information: "Concealment has been the result of the application of [the Housekeeping Act] . . . The purpose of this bill is to correct that situation."). H.R. Rep. No. 85-1461 (1958); *see also* Pub. L. No. 85-619.

C.F.R. § 103.21(e) (U.S. Customs and Border Protection). This practice reflects the longstanding norm of information sharing in matters of overlapping jurisdiction, through which each sovereign may carry out its own law enforcement responsibilities.

When it comes to demands for evidence outside of informal sharing for enforcement operations, DHS's *Touhy* regulations are similar. DHS's regulations require the decisionmaker to consider the public interest; whether disclosure would be consistent with DHS's mission and responsibilities; the need to avoid spending the time and money of the United States for private purposes; and whether the information is otherwise protected by privilege or confidentiality obligations. 6 C.F.R. § 5.48.

### *C. Operation Metro Surge and the Raid on ChongLy "Scott" Thao's Home by Apparent Federal Officials*

In late 2025, the Trump Administration initiated "Operation Metro Surge"—the largest immigration enforcement operation in American history. *See* Ex. 1 to Decl. of Brett Bacon (Bacon Decl.). Thousands of federal officers from agencies including ICE and U.S. Customs and Border Protection (CBP) descended on Minnesota to conduct immigration-enforcement activities, often in residential areas. *See* Ex. 2 to Bacon Decl. This operation represented an unprecedented concentration of federal immigration personnel and was undertaken without coordination with state and local authorities, including police forces charged with maintaining public safety and order. *See id*. One district court in Minnesota found, after an evidentiary hearing, that federal authorities "adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws." *See*

Findings of Fact and Conclusions of Law ¶ 45, *Hussen v. Noem*, No. 26-cv-324, ECF No. 191 (D. Minn. Mar. 9, 2026). Another district court found that ICE infringed on the constitutional right to counsel of detainees held at the Federal Whipple Building as part of Operation Metro Surge. *See* Order at 28, *Advocates for Human Rights v. DHS*, 26-cv-00749, ECF No. 95 (D. Minn. Feb. 12, 2026).

One incident apparently involving federal immigration officials was the raid on the home of ChongLy "Scott" Thao in St. Paul, Ramsey County, Minnesota. Mr. Thao was 56-years old at the time of the incident and is a U.S. Citizen and shared the home with his son, daughter-in-law, and four-year-old grandson. *See* Ex. 3 of Bacon Decl. He has no criminal record. *Id*. According to Mr. Thao, at around 1:30 p.m. on January 18, 2026, a group of apparent federal agents began knocking on the front door of his home, demanding that Mr. Thao and his family members in the home show the officials their identification. *Id*. Video taken at the scene shows masked and armed individuals, who appear to be federal agents, using a battering ram to break the door of the home. *See* Ex. 4 of Bacon Decl. Those individuals are then shown entering the home with guns drawn. *Id*. When the Thaos did not open the door, about eight masked agents broke through the front door and pointed guns at them while Thao's four-year old grandson was sleeping on a sofa. Bacon Decl., Ex. 3. The agents did not announce themselves as ICE officials when they broke into the home. *Id*. The agents began searching the home without showing a warrant and never identified who or what they were looking for. *Id*. The agents then handcuffed Mr. Thao, who was just wearing a pair of blue shorts and white Crocs with a blanket draped over his shoulders, in the home and began to escort him outside. When Mr. Thao asked if he could put some

clothes on before being dragged out into 10-degree temperatures, the federal agents ignored him and escorted him into a car waiting outside. *Id*.

After that, Mr. Thao said "the federal agents drove him around for about an hour, asking him, where he was born and whether or not he had a visa." *Id*. The agents never told Thao where they were going while he was detained in the car. *Id*. Mr. Thao was eventually released after being detained in the car for about an hour. *Id.* The Department of Homeland Security later stated to media that "officers were investigating two convicted sex offenders at that address and that a U.S. citizen living there refused to be fingerprinted or facially identified, so he was detained." Bacon Decl., Ex. 4.

The Ramsey County Sheriff's Office (RCSO) opened a criminal investigation into this incident. Declaration of Bob Fletcher (Fletcher Decl.), ¶ 5. Based on the investigation at that point, it was presumed that the masked and armed individuals involved were agents of one or more DHS agencies, although agents have yet to be individually identified. *Id*., ¶ 6 There is no indication the federal agents had a warrant for entry or arrest, and there is no other evidence available to Ramsey County investigators to determine if the agents acted lawfully. *Id*.

***D. Plaintiffs' Subsequent Touhy Requests***

To further the criminal investigation, on February 24, 2026, the RCSO submitted a letter titled "Request for Information Sharing" to Sam Olson, Department of Homeland Security – Immigration and Customs Enforcement. Feb. 26, 2026 Letter from RCSO to DHS, ECF 9-1. As relevant here, the letter states that the RCSO had opened an investigation based on a report alleging misconduct by federal law enforcement concerning

"the removal of U.S. Citizen Chongly Scott Thao . . . from his residence on January 18, 2026. Based on our preliminary investigation, the incident may have constituted kidnapping, false imprisonment, and potentially other crimes under Minnesota state law." *Id*. The letter further states

> We respectfully request the disclosure and/or sharing of any relevant information, records, intelligence, or investigative materials in the possession of the Department of Homeland Security that may assist our agency in advancing this investigation. Specifically, at this time, we are seeking:
>
> - Any documents, audio and/or video recordings, and statements for any operation directly or indirectly associated with [Mr. Thao's home address], between 01/01/2026 and 01/31/2026.
> - Names of all Federal Agents, from ICE or other agencies, involved in the removal from his home and detainment of U.S. Citizen Chongly Scott Thao [].
>
> The requested information will be used solely for legitimate law enforcement purposes and will be handled in accordance with all applicable confidentiality, privacy, and data protection requirements.
>
> If necessary, we are prepared to execute a formal information-sharing agreement, protective order, or other documentation required by your agency. We are also willing to coordinate through designated points of contact or participate in a joint case conference to ensure appropriate safeguards and compliance.

*Id*. ICE Section Chief Howard Weisman responded to the letter by inviting a RCSO investigator to a meeting on March 5. At that meeting, Weisman said that he was not authorized to share any information. Fletcher Decl., ¶ 8.

Because Weisman did not indicate who told him that he lacked authority to share the information, on March 20, 2026, the RCAO made a formal demand for this information

under *Touhy* to DHS's Office of the General Counsel. Mar. 20, 2026 Ltr. from RCAO to DHS, ECF 9-2. As relevant here, the letter stated that the RCAO demanded

> the production of information necessary to conduct a pending criminal investigation of federal officers under state law. The request is made in the course and scope of an official state criminal investigation being conducted by the Ramsey County Sheriff's Office, in collaboration with this office. We seek materials in DHS's possession, custody, or control that are material and necessary to the investigation and factual determinations of alleged criminal violations occurring within Saint Paul in Ramsey County, Minnesota.
>
> . . .
>
> Federal officers may be found criminally liable under state law unless they act with legal authority in a way that is necessary and proper. Whether or not these officers committed a crime, and whether they may ultimately be immune from prosecution, can only be determined through a full investigation. The public is demanding, and deserves, transparency when authorities may have violated their trust.
>
> . . .
>
> It is the duty of local officials to investigate the possible commission of crimes under state law. Like all states, the State of Minnesota, through its agencies and divisions, has a well-established independent sovereign right and responsibility to investigate possible violations of its criminal laws, including by agents of the federal government. The possible offenses under investigation here include, but are not limited to, kidnapping, false imprisonment, and burglary.

*Id.*, pg. 1.

> All the information requested bears on the pending investigation and will directly assist us in completing a comprehensive review, regardless of outcome. The information will allow us to determine who was involved, what exactly occurred, under what authority those involved were

> acting or believed they were acting, and to begin to assess whether their actions were necessary and proper.

*Id.*, pg. 2. The specific requests stated in the letter were as follows:

> 1. Any and all documents, communications, and records, including electronically stored information, relating to the incident, including but not limited to incident reports, witness information and interview records or notes, use-of-force reports, internal correspondence, body-worn camera or surveillance footage, radio transmissions, GPS/AVL data, and chain-of-command notifications;
> 2. Policies, directives, standard operating procedures, and training materials in effect on January 18, 2026, concerning home entry; the requirements for warrants, and the questioning, apprehension, and detention of immigrants and U.S. citizens;
> 3. Records identifying and reflecting duty status, assignment, and supervisory oversight for any officers or agents of DHS or its subcomponents at the scene of the incident or directly or indirectly involved off-site; and
> 4. Access to interview federal agents and officers on duty on January 18, 2026, in Saint Paul, Ramsey County, Minnesota, and/or who were involved in the incident.

*Id.* The letter concludes:

> To the extent any responsive information is claimed to be sensitive or restricted, we request production subject to appropriate protective measures and redactions consistent with DHS regulations. We will comply with all procedural requirements specified by DHS, including the submission of any required declarations, certifications, or forms, and are prepared to coordinate scope, custodians, search parameters, and production formats to facilitate prompt compliance.
>
> The requested information is essential to assess criminal liability, ensure the integrity of the investigation, and fulfil our obligations under state law; delay or denial would materially impair our ability to determine the facts and administer justice. We may request different or additional information at a later

> date. Please confirm receipt, identify the appropriate DHS component point of contact, and advise of any additional steps required for agency consideration.
>
> We ask for a response to this request by April 30, 2026, and are available to meet and confer at your earliest convenience.

*Id.*, pg. 3.

After the RCAO agreed to extend the deadline to May 29, after several extension requests, DHS failed to respond by the deadline. Plaintiffs then filed the instant suit on July 15. *See* email exchanges between DHS and RCAO, ECF 9-3 and Compl., ECF 1.

After the suit was filed, DHS formally rejected Plaintiffs' *Touhy* requests. In fact, DHS stated that they did not consider Plaintiffs' request to be made pursuant to its *Touhy* regulations because the sought information was "not associated with an ongoing court action." Jul. 21, 2026 Ltr. from DHS to RCAO, pg. 1, ECF 9-5. DHS then stated it was declining to share any of the requested information. *Id.* The rationale for the wholesale rejection was limited to half-a-page of the letter with repeated citations to "U.S. Immigrations and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information*." *Id.*, pg. 3 n.8-14. DHS did not cite its *Touhy* regulations in denying the request. *See generally id.* DHS's limited "rationale" for rejecting DHS's letter *Touhy* requests closely mirror DHS's letter denying Hennepin County's *Touhy* requests. *See* June 4, 2026 Ltr. from DHS to Hennepin County Attorney, pg. 4-5, ECF 9-4.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

To survive a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In reviewing whether a complaint states a claim on which relief may be granted, this Court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008).

Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

A claim under § 706(1) of the APA grants courts authority to "compel agency action unlawfully withheld or unreasonable delayed." 5 U.S.C. § 706(1). "A claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). The Supreme Court has said that a "failure to act" in this context is "not the same thing as a denial." *Id*. at 63 (internal quotation marks omitted).

A claim under § 706(2)(A) of the APA grants courts authority to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While this review is deferential, it still requires "thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), to determine whether an agency action was both "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency's decisionmaking is not reasonable if it "relied on factors which Congress has not intended," "failed to consider an important aspect of the problem," runs counter to the evidence before the agency," or lacks a "rational connection between the facts . . . and the choice made." *Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In the typical APA case, the focal point for judicial review is the "administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). But that principle presupposed that the agency has in fact generated a reviewable record reflecting the basis for its action. Where, as here, the agency's determination is based on threadbare legal determinations, courts may consider extra-record materials as necessary to determine what action was taken, whether it is final, and whether it was reasonable. *See e.g., Citizens to Preserve Overton Park*, 401 U.S. at 420 (permitting inquiry beyond the existing record where there are no formal findings or where the record is inadequate for review).

In addition to their APA claim, Plaintiffs bring a claim under the Tenth Amendment. This Court has the equitable power under this claim to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015).

## ARGUMENT

### I. Defendants' Denials are Reviewable Under the APA

#### a. Defendants' July 21, 2026 Response to Plaintiffs' *Touhy* Requests Does not Moot Plaintiffs' § 706(1) claim

Defendants argue that their July 21, 2026 letter formally rejecting Plaintiffs' *Touhy* requests, which was sent after initiation of this action, has mooted Plaintiffs' § 706(1) claim. That is not the case because this Court can order Defendants to comply with Plaintiffs' demands. Mootness is a jurisdictional question because the Court is not empowered to decide "moot questions or abstract propositions." *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (quotation omitted). Defendants have the burden of establishing mootness. *Iowa v. Wright*, 154 F.4th 918, 940 (8th Cir. 2025).

Defendants cannot meet this burden. "If a party has a sufficient stake in the outcome so that the court's rendering of relief alleviates the harm complained of, the question presented is not moot." *In re Grand Jury Subpoenas Duces Tecum*, 78 F.3d 1307, 1310 (8th Cir. 1996). Here, the Court can grant Plaintiffs relief under § 706(1) by compelling Defendants to follow their own regulations in processing Plaintiffs' *Touhy* requests. DHS's *Touhy* regulations require it to follow certain procedures when, as relevant here, receives

"requests or demands" from federal or state authorities. *See* 6 C.F.R. § 5.41(a) ("This subpart C sets for the procedures *to be* followed . . ." (emphasis added)).

Defendants did not fulfil their legal obligations here. In fact, it flat out refused to apply their own *Touhy* regulations to Plaintiffs' requests because it was "not associated with an ongoing court action." Jul. 21, 2026 Ltr. from DHS to RCAO, pg. 1, ECF 9-3. As argued below in Section II(a), there is no such requirement in DHS's *Touhy* regulations. This decision was thus unlawful. Therefore, this claim is not moot because the Court can still grant Plaintiffs relief under § 706(1).

**b. Defendants' Denial Constitutes Final Agency Action**

There is plainly a final agency action here. An agency decision is final, and thus subject to judicial review, if two factors are met: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted).

Defendants' response to Plaintiffs' *Touhy* requests meets the first *Bennett* factor as it is clearly the consummation of their decision-making process. "An action consummates the agency's decisionmaking process when it is the agency's 'last word on the matter'" *Brake Plus NWA, Inc. v. United States Dept. of Transportation*, 176 F.4th 1037, 1041 (8th Cir. 2026) (quoting *Whitman v. Am, Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). Defendants' July 21 letter stated that "ICE declines your request" and provides no information as to how to seek review of that decision. Jul. 21, 2026 Ltr. from DHS to RCAO, pg. 1, ECF 9-3. There is no indication from the letter that Defendants intend to

further consider the matter or that their decision is tentative. In fact, Defendants' Memorandum of Law repeats the assertion that "Plaintiffs do not have a legal right to this information." Mem. of Law., pg. 18, ECF 16. Thus, the first *Bennett* factor has been met.

Defendants' response also meets the second *Bennett* factor. "With respect to the second *Bennett* factor, 'direct and applicable legal consequences' flow when an agency applies its authoritative interpretation of a statutory or regulatory framework to specific facts." *Brake Plus*, 176 F.4th at 1042 (quoting *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 525 (8th Cir. 2024)). Defendants' July 21 letter puts forth an authoritative interpretation of their *Touhy* regulations by firmly stating Plaintiffs' requests do not meet their procedural requirements and ultimately conclude that Plaintiffs have no legal right to the documentation and information they seek. *See generally* Jul. 21, 2026 Ltr. from DHS to RCAO, ECF 9-3. The Eighth Circuit has ruled that agency action such as this met the second *Bennett* factor and was a final agency decision. *See Brake Plus*, 176 F.4th at 1043-44 (ruling that NHTSA's letter stating that certain car components were out of compliance constituted final agency action where the agency "applied its authoritative interpretation of its [regulations] and [and its governing statute] to reach legal conclusion about" the matter at issue). Thus, the second *Bennett* factor is met.

The bulk of Defendants' remaining arguments as to why there is no final agency action here rests on their faulty analysis that Plaintiffs' *Touhy* requests did not meet the procedural requirements necessary for Defendants to apply their *Touhy* regulations. Plaintiffs outline why this analysis is faulty in Section II(a)below.

Defendants throw in one other argument that can be quickly addressed. Defendants assert that there is no final agency action here because their response "was not a definitive *Touhy* denial at all because the regulations never applied." Mem. of Law, pg. 14, ECF 14. This is a Kafkaesque argument. The only way Defendants' argument makes sense here is to assert that they might someday process Plaintiffs' request under their *Touhy* regulations even though they have definitively decided not to apply that framework at all. Defendants' statement that they are not going to apply their own regulations to Plaintiffs' lawful *Touhy* requests is enough to rule that Defendants rendered a final agency action subject to judicial review.

**c. Defendants' Decision is not Committed to Agency Discretion by Law**

Defendants argue that their decision not to apply their own regulations in processing Plaintiffs' *Touhy* requests is unreviewable by this Court because that decision was "'committed to agency discretion by law.'" Mem. of Law, pg. 19, ECF 16 (quoting 5 U.S.C. § 701(a)(2)). This argument does not withstand scrutiny.

There is a "well-settled and strong presumption" favoring judicial review of agency action." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (quotations omitted). "The 'committed to agency discretion' exception is a 'very narrow exception' that 'is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Tamenut v. Mukasey*, 521 F.3d 1000, 1003 (8th Cir. 2008) (quoting *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 410 (quotation omitted)). Courts have held that actions are committed to agency discretion where it is not possible to "'devise an adequate standard of review for an agency action.'" *Ngure v. Ashcroft*, 367

F.3d 975, 982 (8th Cir. 2004) (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). Moreover, courts have "generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,' such as a decision not to institute enforcement proceedings." *Dep't. of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). "As a general matter, unless there is persuasive reason to believe that Congress intended to preclude judicial review, [the] Court will not preclude review." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155-56 (2025) (quotation omitted). The analytical focus in "committed to agency discretion" disputes is on the language of the *statute, See e.g., Dep't of Com.*, 588 U.S. at 772.

Defendants argue that Plaintiffs have failed to show what authority *compels* them "to share the investigatory law enforcement information that [Plaintiffs] seek." Mem. of Law., pg. 21, ECF 21. But the Housekeeping Act, the statutory authority for the relevant regulations, expressly provides that it "does *not* authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301 (emphasis added). This language was added as an amendment to the original Housekeeping Statute to correct the situation where agency officials used the Housekeeping Act as a shield against disclosure. *See* H.R. Rep No. 85-1461 at 3353 (1958) ("Executive officials have let every file clerk become a censor. The purpose of this bill is to correct that situation"); *see also U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1255-56 (8th Cir. 1998) (stating that the 1958 amendment to 5 U.S.C. § 301, "expresses a clear

congressional mandate that agencies cannot promulgate regulations exempting themselves from their duty to make information available to the public").

Defendants' argument that their denial of Plaintiffs' *Touhy* requests were unreviewable as enforcement actions is meritless for similar reasons. "Enforcement actions" are typically categorized as agency decisions "not to prosecute or enforce, whether through civil or criminal process." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (listing cases). Defendants' refusal to produce information and documentation in response to Plaintiffs' valid *Touhy* requests are not enforcement requests. [3]

Finally, Defendants argue that their decision is not subject to review because their *Touhy* regulations did not grant Plaintiffs any substantive or procedural rights to give them a cause of action. But at issue is whether agency *action* at issue was unlawful and section 706 of the APA clearly gives the Court authority to compel, hold unlawful, and set aside unlawful agency action. 5 U.S.C. § 706(1)-(2). Defendants' assertion to the contrary is based on the uncontroversial position that DHS's *Touhy* regulations are exempt from APA *notice and comment rulemaking* procedures, *see* Mem. of Law, pg. 23, ECF 16 (citing *Gillette v. Herbert*, No. 2017-0042, 2020 WL 5579824 (D.V.I. Sept. 16, 2020)), and that regulations that are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are not judicially reviewable, *United States v. Manafort*, 312 F. Supp. 3d 60, 75 (D.D.C. 2018) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 & n.20 (1979)). Courts regularly hear § 706(1) and (2) claims when Plaintiffs

[3] Plaintiffs address Defendants' brief argument that "the agency's *Touhy* regulations expressly carve out law enforcement sharing from the *Touhy* framework in II(a) below.

challenge an agency's response to their *Touhy* requests. *See, e.g., Gulluni v. Levy*, 85 F.4th 76 (1st Cir. 2023); *U.S. E.P.A. v. General Elec. Co.*, 197 F.3d 592 (2d Cir. 1999); *Exxon Shipping Co. v. U.S Dept. of Interior*, 34 F.3d 774 (9th Cir. 1994).

## II. Defendants' actions were arbitrary and capricious

### a. Defendants' Stated Reasons in their July 21 Letter for Not Applying their *Touhy* Regulations to Plaintiffs' Requests were Arbitrary and Capricious

Defendants, in their July 21 Letter, provided two reasons for not applying their *Touhy* regulations to Plaintiffs' requests: (1) the requests were not "associated with an ongoing court action" and (2) 6 C.F.R. § 5.41(i) provides that *Touhy* regulations do not apply to requests from law enforcement agencies. July 21, 2026 Ltr. from DHS to RCAO, pg. 1 &n.1 & 2, ECF 9-5. Both rationales are wholly without merit.

First, the regulations do not require *Touhy* requests to be related to "ongoing court action." As relevant here, DHS's *Touhy* regulations require application

> in response to subpoenas, orders, or other requests or demands of federal or state judicial or quasi-judicial or administrative authority as well as state legislative authorities (collectively, "demands"), whether civil or criminal in nature, or in response to requests for depositions, affidavits, admissions, responses to interrogatories, document production, interviews, or other litigation-related matters.

6 C.F.R. § 5.41(a)(2). By referring to a demand coming from "a court, administrative agency, or other authority," the regulation clearly sweeps beyond the narrow, court-limited definition of "proceeding" offered by Defendants. Similarly, DHS regulations explain that the procedures apply "in connection with federal or state litigation," *and* any "requests or demands" "in response to requests for depositions, affidavits, admissions, responses to

interrogatories, document production, interview, or other litigation-*related* matters." 6 C.F.R. § 5.41(a)(2)(emphasis added). Here, the RCAO is acting as a state administrative authority investigating possible violations of state criminal law as it has the power to "prosecute felonies, including the drawing of indictments found by the grand jury," and certain misdemeanors, and other rules or regulations. Minn. Stat. § 388.051, subd. 1(3). Likewise, the RCSO has the power to, *inter alia* "pursue and apprehend all felons."[4] Minn. Stat. § 387.03.

Even though the regulations apply to requests that are "litigation-*related*," Defendants nonetheless insist that Plaintiffs' requests are faulty because they did not meet the definition of "litigation" in the regulations. July 21, 2026 Ltr. from DHS to RCAO, ECF 9-5, pg. 1 n.1. But this argument rests on an incomplete definition of "litigation." In their Memorandum of Law, Defendants cite or partially quote the regulatory subsection defining "litigation" eight times, *see* Mem. in Support, ECF 16, pg. 3, 14, 16-17, 20, but curiously omit the following language each time: "[t]his subpart governs, inter alia, responses to discovery requests, depositions, and other pre-trial, trial, or post-trial proceedings, as well as responses to informal requests by attorneys or others in situations involving litigation." 6 C.F.R. § 5.41(d) (emphasis added). The inclusion of this term

[4] For these reasons, Defendants' argument that Plaintiffs do not qualify as a "state judicial or quasi-judicial administrative authority," because they are designated by law as an "executive" agency, Mem. of Law, pg. 15, ECF 16, is wholly without merit. *See, e.g.*, *Administration(1)*, Black's Law Dictionary (12th ed. 2024) (defining "administration" as "[t]he management or performance of the executive duties of government, institution, or business").

makes it plain that Plaintiffs' requests in their current form meets the definition of "litigation." Not only are Plaintiffs' request from a state administrative authority that is investigating possible violations of state law, but it is also undoubtedly an "informal request" by attorneys in situations "involving litigation." *Id.*

Defendants' interpretation that a court proceeding is required would lead to absurd results. In Minnesota, criminal proceedings are commenced by either a grand jury indictment or by filing of a complaint, signed by a prosecutor, supported by an affidavit, and approved by a judge. Minn. R. Crim. P. 2. Both require some showing of probable cause that an offense has been committed by a person. Minn R. Crim. P. 2.01 (complaint); Minn. R. Crim. P. 18.06 (grand jury). But Plaintiffs cannot determine whether they could show probable cause for initiating criminal proceedings without knowing important details that are exclusively within Defendants' possession, such as whether the agents had legal authority to enter the premises and the identity of those involved. Furthermore, it is not certain that Plaintiffs would criminally charge federal agents in the first place. It is definitely possible that once Plaintiffs review the requested information and documentation, they could determine that there are no reasons to criminally charge anyone. Choi Decl., ¶¶ 7-8, 10, 19-20; Fletcher Decl., ¶ 12.

Second, Defendants' assertion that 6 C.F.R. § 5.41(i) means that their *Touhy* regulations do not govern requests from local law enforcement agencies is blatantly contradicted by the plain meaning of the subsection's text, context from other parts of DHS's *Touhy* regulations, and longstanding practice between state and federal law enforcement agencies. As relevant here, the subpart states that "[n]othing in this subpart

*affects* the disclosure of official information . . . to federal, state, or foreign prosecuting and law enforcement authorities." 6 C.F.R. § 5.41(i) (emphasis added). The use of the word "affects" here implies that DHS intended for its *Touhy* regulations to not impose a barrier to requests from local law enforcement officials. *See Affect (vb.)*, Black's Law Dictionary, (12th ed. 2024) (defining "affect" as "[m]ost generally, to produce an effect on; to influence in some way"). Contrast the use of the word "affects" here with DHS's directive stating that the subpart defining "litigation" "*shall not apply*" in certain cases. 6 C.F.R. § 5.41(d). If DHS, in drafting its regulations, wanted to say that its *Touhy* regulations did not apply to requests for law enforcement agencies, it could have used the phrase "shall not apply" as it did earlier in the same regulatory section. Moreover, the prior longstanding practice between federal and state authorities in criminal investigations also supports the view that § 5.41(i) implies that DHS intended for its *Touhy* regulations to not impose a barrier to requests from local law enforcement officials. *See* Evans Decl., ¶¶ 7-10; Choi Decl., ¶ 20; Fletcher Decl., ¶ 11. Therefore, Defendants' action of not applying their *Touhy* regulations to Plaintiffs' requests was arbitrary and capricious.

**b. Defendants' July Letter was Arbitrary and capricious because it Unreasonably Rejected the Option to Share Information Pursuant to the Law Enforcement Sharing Provision in the *Touhy* Regulations**

Even if Defendants were right that Plaintiffs' requests did not trigger the restrictive procedures spelled out in their regulations, then Defendants would have still identified no law that justifies their refusal to share evidence. As stated earlier, Defendants' refusal to share evidence must still be reasonable and reasonably explained. *See Citizens to Preserve Overton Park*, 401 U.S. at 416. It was not. Rather, Defendants took their view that the

*Touhy* framework's requirements were not triggered and attempted to turn that, without explanation, into a substantive basis for refusing to share evidence. That was error and, as discussed above in II(a), that error is reviewable. Defendants must, at a minimum, provide a reasoned explanation for why they did not provide the requested evidence to the Plaintiffs.

In addition to being contrary to law for the reasons discussed above, the July letter was arbitrary and capricious because it cursorily dismissed the option to share information through the law enforcement exception. In the July letter, Defendants provide a laundry list of objections to Plaintiffs' requests without reasoning, but each stated objection can be easily refuted. Even though DHS stated that Plaintiffs' request "implicated information protected from disclosure by statute or federal regulations," they did not cite or reference a statue that was allegedly implicated. *See* July 21, 2026 Ltr. from DHS to RCAO, pg. 3, ECF 9-5. DHS's statement that Plaintiffs' request sought "law-enforcement sensitive files . . . without any identified scope or time limitations," is factually incorrect: Plaintiffs' requests were limited to information relating to the raid on Mr. Thao's home. *See id.* and March 20, 2026 Ltr. from RCAO to DHS, pg. 2, ECF 9-2.

DHS's assertion that the sought information was "For Official Use Only-Law Enforcement Sensitive, and you have not established your need to know" shows that Defendants failed to properly consider Minnesota's sovereign interest in rejecting Plaintiff's requests. Minnesota has well-recognized sovereign interests in investigating crime within its territory, enforcing its criminal laws, protecting victims, and ensuring public confidence in impartial justice. *See Heath*, 474 U.S. at 93. And Plaintiffs

communicated their need for this information to conduct a proper investigation into possible violation of state criminal law. *See* Feb. 24, 2026 Ltr. from RCSO to DHS, ECF 9-1; Mar. 20, 2026 Ltr. from RCAO to DHS, ECF 9-2. The failure to even recognize or consider this state interest was arbitrary and capricious. *See Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204, 1227 (D. Kan. 2023) (invalidating *Touhy* denial where government "failed to consider an important aspect of the problem—specifically, [the requestor's] need to procure the information"); *see also Motor Vehicle Mfrs.*, 463 U.S. at 43 (explaining that an agency violates the "arbitrary and capricious" standard if it "entirely fail[s] to consider an important aspect of the problem").

Finally, DHS's assertion that the sought information *may* contain deliberate process, attorney work product, attorney client privileged information, or personal identifying information of involved agents is an irrational reason to deny Plaintiffs' request entirely. July 21, 2026 Ltr. from DHS to RCAO, pg. 2-3, ECF 9-5). The fact that there *might* be privileged information in responsive documents cannot justify withholding all documents; Defendants could simply redact privileged information, which is a regular practice for requests for information. *See e.g., Upsher-Smith Laboratories, Inc.*, 2017 WL 7369881, at *10 (examining DOJ's numerous stated reasons for not producing a document responsive to a *Touhy* request in determining that withholding of that document was not arbitrary and capricious). Furthermore, Fed. R. Civ. P. 5.2 requires redactions of personal identifying information of all individuals, which addresses any concerns about revealing personal identifying information of any involved federal agents to the public.

DHS's failure to provide any meaningful reasoning behind their decision clearly shows that they did not "reasonably consider[] the relevant issues and reasonably explain[] [their] decision." *Prometheus Radio Project*, 592 U.S. at 423. And the fact that this practice flies in the face of the longstanding cooperation between federal and local officials in sharing law enforcement information, with such little reason for the change, is precisely the type of unacknowledged and unexplained change in longstanding practice that is a hallmark of arbitrariness. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[T]he agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009)). Therefore, Defendants' actions in rejecting Plaintiffs' request were arbitrary and capricious.

### III. The Federal Government's Decision to Block Local Criminal Investigations Violates the Tenth Amendment

The Tenth Amendment was enacted "to allay lingering concerns about the extent of the national power," *Alden v. Maine*, 527 U.S. 706, 713-14 (1999), and it affirmatively guarantees that the federal government cannot enlarge its authority at the expense of sovereign powers retained by the States, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) ("A healthy balance of power between the States and the Federal Government reduces the risk of tyrant and abuse from either from either front." (quotations and citations omitted)). And among other things, the Tenth Amendment means that the federal government cannot tell a state how to perform its sovereign functions. *Id.*

Chief among the powers reserved to the States is the police power—the authority to investigate, deter, and prosecute crimes committed within state borders. *Heath*, 474 U.S. at 93 ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code."). Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see Shinn v. Ramirez*, 596 U.S. 366, 376 (2022) ("The power to convict and punish criminals lies at the heart of the States' 'residuary and inviolable sovereignty'" (quoting The Federalist No. 39)). The federal government intrudes on that power when it prevents a State from identifying actors, interviewing witnesses, examining physical evidence, and reconstructing events. The federal government may not wield control over evidence or federal personnel as a means of obstructing a state's own criminal enforcement functions. The Constitution permits dual sovereignty, not federal nullification of state police power by Executive fiat.

Defendants' response to this is to invoke the Supremacy Clause, but that argument goes nowhere. The "Supremacy Clause is not the source of any federal rights," *Armstrong*, 575 U.S. at 324 (citation modified), and "[t]here is no federal preemption *in vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020); *see also id.* at 212 ("The Supremacy Clause gives priority to the Laws of the United States, not . . . preferences of federal officers." And "particularly" "in a field which the States have traditionally

occupied, [courts] start with the assumption that the historic police powers of the States" remain intact. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation modified).

Defendants argue that Plaintiffs seek "to abrogate the federal government's sovereignty by requiring it to assist in their investigations." Mem. of Law, pg. 32, ECF 16. But Plaintiffs are not asking Defendants to commit any of their personnel or resources to investigate potential criminality here, it only asks Defendants to follow their own regulations. The result of Defendants not following their own regulations has resulted in effectively obstructing the County to exercise its sovereign powers to enforce state criminal law. Without the requested documents, Plaintiffs cannot effectively ascertain whether federal officials violated state law in conducting the raid on Mr. Thao's home. Consequently, Defendants' actions amount to impeding Plaintiffs' sovereign prerogative to enforce its own criminal laws, which violates the Tenth Amendment.

## IV. The Court Should Grant Plaintiffs' Requested Relief

If the Court concludes that Plaintiffs are entitled to summary judgment on their APA or Constitutional claims, the Court should direct the Defendants to immediately provide Plaintiffs with access to the requested evidence and issue a permanent injunction against further obstruction. Although the default rule in APA cases is to vacate and remand erroneous decision back to the agency, that default rule does not apply here for several reasons.

First, Defendants' action violates the Tenth Amendment, and the Court has the authority to issue appropriate injunctive relief to remedy that violation without awaiting further explanation from the agency. *See Trump v. CASA*, 606 U.S. 831, 851 (2025) ("[t]he

equitable tradition [of courts] has long embraced the rule that courts generally may administer complete relief between the parties") (quotation omitted).

Second, even just for the APA claims, when there is only one reasonable outcome, "remand may be unwarranted in cases where there is not the slightest uncertainty as to the outcome of the agency's proceedings on remand." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629-630 (2023) (quotation omitted). Here, Defendants have identified no legal authority or rational basis justifying their obstruction of state criminal investigations. Defendants should not get yet another bite at the apple when they have already weaponized the administrative process to create delay that furthers their illegitimate obstruction. Finally, every day that Defendants are not ordered to provide Plaintiffs with the evidence increases the risk of spoliation and prevents Plaintiffs from carrying out their sovereign responsibilities. *Cf. Abbot v. Perez*, 585 U.S. 579, 602 n.17 (2018) (a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.") In the alternative, if the Court does not order Defendants to comply with Plaintiffs' requests, it should vacate the denials and, retaining jurisdiction, remand for Defendants to consider Plaintiffs' request by a date certain.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss and grant summary judgment to Plaintiffs.

**JOHN J. CHOI**
RAMSEY COUNTY ATTORNEY

Dated: October 27, 2026

By: __/s/ Brett Bacon________
Brett Bacon (#0400776)
Mark Haase (#0386726)
Hao Nguyen (#0391385)
Assistant Ramsey County Attorneys
360 Wabasha St. N., Suite 100
St. Paul, MN 55101
651-627-5473 (Bacon)
651-266-3196 (Haase)
651-266-3152 (Nguyen)
brett.bacon@ramseycountymn.gov
mark.haase@ramseycountymn.gov
hao.nguyen@ramseycountymn.gov

**ATTORNEYS FOR PLAINTIFFS**